**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1996
_____

ERICK ZANETICH, on behalf of himself and those
similarly situated,
Appellant

v.

WAL-MART STORES EAST, INC., doing business
as Walmart Inc.; SAM'S EAST INC., doing business
as Sam's Club Fulfillment Center
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1:22-cv-05387)
District Judge:  Honorable Christine P. O'Hearn
_____

Argued: March 6, 2024
_____

Before:  JORDAN, PHIPPS, and FREEMAN, *Circuit Judges*

(Filed: December 9, 2024)

Justin L. Swidler      **[ARGUED]**
SWARTZ SWIDLER
9 Tanner Street
Suite 101
Haddonfield, NJ 08033

*Counsel for Appellant*

Misha Tseytlin      **[ARGUED]**
TROUTMAN PEPPER
227 W Monroe Street
Suite 3900
Chicago, IL 60606

*Counsel for Appellees*

———————

## OPINION OF THE COURT

———————

PHIPPS, *Circuit Judge*.

In 2021, as part of its efforts to legalize and regulate marijuana use "in a similar fashion to the regulation of alcohol for adults," New Jersey enacted the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act – referred to herein as 'CREAMMA.' N.J. Pub. L. 2021, ch. 16 (amending N.J. Stat. §§ 18A, 24, 40, and 54). One of the provisions of CREAMMA prohibits employers from refusing to hire a job applicant for the use of cannabis. *See* N.J. Stat. § 24:6I-52(a)(1). CREAMMA, however, does not expressly provide a private remedy for redressing employment discrimination against cannabis users. And, in 2022, a retailer in New Jersey rescinded an offer of employment to a job applicant because he tested positive for cannabis.

Claiming that the retailer's decision violated CREAMMA, that job applicant initiated this two-count lawsuit individually and on behalf of a putative class. The first count sought redress on the theory that CREAMMA implies a remedy for violations of its employment protections. The second count pursued a claim for pre-employment discrimination in violation of public policy. The retailer moved to dismiss both counts, and the District Court granted that motion on the grounds that neither presented a legally viable claim.

In this appeal, the job applicant challenges that ruling and alternatively seeks certification to the New Jersey Supreme Court of the state-law issues underlying both claims. On *de novo* review of the District Court's decision, we will affirm the judgment of the District Court, and exercising our discretion, we will not certify either question.

## I. STATUTORY BACKGROUND

At least as far back as 1933, New Jersey criminalized the use and possession of cannabis. *See* N.J. Pub. L. No. ch. 186, arts. I–III (1933). That prohibition began to be relaxed in 2010 with the passage of legislation that exempted the medical use of cannabis from criminal liability under New Jersey law. *See* N.J. Pub. L. No. 2009, ch. 307 (codified at N.J. Stat. §§ 24:6I-1–24:6I-16) (permitting limited medical use of cannabis for "debilitating medical conditions"). In 2019, the New Jersey Legislature broadened the medical-use exception and created a state agency – the Cannabis Regulatory Commission – to oversee the licensing and regulation of medical marijuana distributors. *See* N.J. Pub. L. No. 2019, ch. 153 (codified as amended at N.J. Stat. §§ 24:6I-1–24:6I-30, 26:2H-12.86, 30:6D5-b, 45:1-45.1, 45:9-27.16, 45:9-27.19, 45:11-49, 52:13D-13, 52:13D-17.2, 2C:35-18, 18A:40-12.22). Then, in November 2020, through a ballot initiative, Garden State

voters, by a two-to-one margin,[1] approved an amendment to the New Jersey Constitution that legalized and regulated the possession and use of marijuana by persons over age 21. N.J. Const. art. IV, § VII, ¶ 13 (effective Jan. 31, 2021). *But cf.* 21 U.S.C. § 812 (listing "marihuana" as a Schedule I controlled substance); Schedules of Controlled Substances: Rescheduling of Marijuana, 89 Fed. Reg. 44597-01, 44601 (proposed May 21, 2024) (to be codified at 21 C.F.R. pt. 1308) (proposing a transfer of marijuana from Schedule I to Schedule III).

Within a month of the effective date of that amendment, on February 22, 2021, New Jersey enacted CREAMMA, which provides a statutory grounding for the regulation of cannabis in the state. *See* N.J. Pub. L. No. 2021, ch. 16. The New Jersey Legislature announced and codified three broad purposes of CREAMMA:

1. to adopt a new approach to our marijuana policies by controlling and legalizing a form of marijuana, to be referred to as cannabis, in a similar fashion to the regulation of alcohol for adults . . .

2. [to] prevent the sale or distribution of cannabis to persons under 21 years of age . . . [and]

3. to eliminate the problems caused by the unregulated manufacturing, distribution, and use of illegal marijuana within New Jersey[.]

---

[1] Official Results, New Jersey General Election (Nov. 3, 2020), Public Question No. 1: Constitutional Amendment to Legalize Marijuana [https://perma.cc/UZL6-XURQ].

N.J. Stat. § 24:6I-32(a)–(c).

The New Jersey Legislature also made a dozen factual findings in support of CREAMMA. *See id*. § 24:6I-32(d)–(o). Several of those related to law enforcement. For instance, the Legislature found that CREAMMA "will divert funds from marijuana sales from going to illegal enterprises, gangs, and cartels," *id.* § 24:6I-32(d), and that "[c]ontrolling and legalizing cannabis for adults in a similar fashion to alcohol will strike a blow at the illegal enterprises that profit from New Jersey's current, unregulated illegal marijuana market," *id.* § 24:6I-32(h).[2] Other findings addressed public health concerns, such as the conclusion that "[a] controlled system of cannabis manufacturing, distribution, and sales must be designed in a way that enhances public health and minimizes harm to New Jersey communities and families." *Id.* § 24:6I-32(l).[3] In a similar vein, other findings focused on the

_____

[2] Several other findings also related to law enforcement, specifically: that "New Jersey spends approximately $127 million per year on marijuana possession enforcement costs," N.J. Stat. § 24:6I-32(f); that "[c]ontrolling and legalizing cannabis for adults in a similar fashion to alcohol will free up precious resources to allow our criminal justice system to focus on serious criminal activities and public safety issues," *id.* § 24:6I-32(g); that "Black New Jerseyans are nearly three times more likely to be arrested for marijuana possession than white New Jerseyans, despite similar usage rates," *id.* § 24:6I-32(e); and that "New Jersey cannot afford to sacrifice public safety and individuals' civil rights by continuing its ineffective and wasteful past marijuana enforcement policies," *id.* § 24:6I-32(o).

[3] Other public health findings related to increased attention to addressing substance use disorder. *See* N.J. Stat. § 24:6I-32(i) ("New Jersey must strengthen its support for evidence-based, drug use prevention programs that work to educate New Jerseyans, particularly young New Jerseyans, about the harms

importance of preventing underage cannabis use. *See id.* § 24:6I-32(m) (finding that "[t]he legalized cannabis marketplace in New Jersey must be regulated so as to prevent persons younger than 21 years of age from accessing or purchasing cannabis"); *id.* § 24:6I-32(k) (reasoning that "[c]ontrolling and regulating the manufacturing, distribution, and sales of cannabis will strengthen our ability to keep it along with illegal marijuana away from minors"). Finally, one of the factual findings related to the consequences of arrests for marijuana, including the negative effects on future employment:

> A marijuana arrest in New Jersey can have a debilitating impact on a person's future, including consequences for one's job prospects, housing access, financial health, familial integrity, immigration status, and educational opportunities . . . .

*Id.* § 24:6I-32(n).

In furtherance of those purposes and findings, CREAMMA delegated significant authority to the Cannabis Regulatory Commission. It conferred jurisdiction on the Commission over "any person who buys, sells, cultivates, produces, manufactures, transports, or delivers any cannabis or cannabis items within this State." *Id.* § 24:6I-34(a). Under CREAMMA, the Commission also may "exercise all powers incidental, convenient, or necessary to enable the Commission to administer or carry out the provisions of [CREAMMA]." *Id.* § 24:6I-34(b)(5). And the Commission is to "oversee the development, regulation, and enforcement of activities

_____

of substance use disorder."); *id.* § 24:6I-32(j) ("New Jersey must enhance State-supported programming that provides appropriate, evidence-based treatment for those who suffer from the illness of substance use disorder.").

6

associated with the personal use of cannabis." *Id.* § 24:6I-24(a)(2).

Also, as part of its overall approach to cannabis regulation, CREAMMA prohibited two forms of employment discrimination. First, it outlawed employment discrimination based on a person's use or non-use of cannabis:

> No employer shall refuse to hire or employ any person or shall discharge from employment or take any adverse action against any employee with respect to compensation, terms, conditions, or other privileges of employment because that person does or does not smoke, vape, aerosolize or otherwise use cannabis items . . . .

*Id.* § 24:6I-52(a)(1). Second, it protected employees from adverse employment actions based solely on a positive cannabis drug test:

> [A]n employee shall not be subject to any adverse action by an employer solely due to the presence of cannabinoid metabolites in the employee's bodily fluid from engaging in conduct permitted under [CREAMMA].

*Id.*

CREAMMA also set express bounds for those employment protections. They do not prevent employers from "maintain[ing] a drug- and alcohol-free workplace." *Id.* § 24:6I-52(b)(1)(a). Nor do those protections "require an employer to permit or accommodate the use, consumption, being under the influence, possession, transfer, display, transportation, sale, or growth of cannabis or cannabis items in the workplace." *Id.* As a further limitation, CREAMMA made explicit that its cannabis-related provisions should not be

construed to "amend or affect in any way any State . . . law pertaining to employment matters." *Id.* § 24:6I-55(a).

The Cannabis Regulatory Commission has exercised some, but seemingly not the full extent, of its authority with respect to CREAMMA's employment protections. It has promulgated regulations[4] and issued guidance documents.[5] One of those guidance documents, issued in September 2022 to "all employers," explained that a positive drug test when combined with evidence of impairment may justify an adverse employment action:

> A scientifically reliable objective testing method that indicates the presence of cannabinoid metabolites in the employee's bodily fluid alone is insufficient to support an adverse employment action. However, such a test combined with evidence-based documentation of physical signs or other evidence of impairment during an employee's prescribed work hours may be sufficient to support an adverse employment action.

N.J. Cannabis Regul. Comm'n, *Guidance on "Workplace Impairment"* 1 (2022) [https://perma.cc/25WT-DZWP]. The Commission, however, has not taken any formal enforcement action against employers who violate CREAMMA's employment protections.

---

[4] *See, e.g.*, N.J. Admin. Code §§ 17:30-1.1–17:30-20.10 (2023) ("Personal Use Cannabis Rules").

[5] *See, e.g.*, N.J. Cannabis Regul. Comm'n, *Manufacturing and Retailing of Ingestible Cannabis Products* (2023) [https://perma.cc/QV2D-G8FV].

## II. FACTUAL BACKGROUND
## (AS ALLEGED IN THE COMPLAINT)

In January 2022, less than a year after the enactment of CREAMMA, New Jersey citizen Erick Zanetich applied for an asset protection position at a Walmart facility in Swedesboro, New Jersey. A week later, he was offered a job there – subject to the condition that he take and pass a drug test. That condition reflected a corporate policy – in effect even after CREAMMA – under which all job applicants and employees were ineligible for future employment upon testing positive for drugs. Zanetich tested positive for cannabis, and his job offer was rescinded.

## III. PROCEDURAL HISTORY

Prompted by the rescission of his job offer, Zanetich filed a two-count putative class-action complaint in the Superior Court of Gloucester County against Walmart and one of its affiliated corporations. For relief, Zanetich sought back pay, front pay, punitive damages, and an injunction ordering rescission of the corporate drug policy among other remedies, but, as allowed by New Jersey law,[6] his complaint did not demand a sum certain. Walmart and the affiliated corporation – neither of which has citizenship in New Jersey[7] – removed the case to federal court, invoking the District Court's diversity

---

[6] *See* N.J. Ct. R. 4:5-2 ("If unliquidated money damages are claimed in any court, other than the Special Civil Part, the pleading shall demand damages generally without specifying the amount.").

[7] The entity doing business as Walmart is Walmart Stores East, LLC, which has as its sole member Walmart, Inc., a Delaware corporation with a principal place of business in Bentonville, Arkansas. The affiliated corporation, Sam's East, Inc., is a citizen of Arkansas by incorporation and by its principal place of business. For purposes of this opinion, they are both referred to as 'Walmart.'

jurisdiction on the grounds that Zanetich was not a citizen of the same states as Walmart and the amount in controversy exceeded $75,000. *See* 28 U.S.C. §§ 1332(a)(1), 1441(a), 1446(a), (c). Neither Zanetich nor the District Court contested the plausibility of Walmart's statements about the amount in controversy, so no evidence-based showing was required to perfect removal, and the District Court properly exercised subject matter jurisdiction over this case. *See Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014) ("[A]s specified in [28 U.S.C.] § 1446(a), a defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold. Evidence establishing the amount is required by [28 U.S.C.] § 1446(c)(2)(B) only when the plaintiff contests, or the court questions, the defendant's allegation."); *cf.* 14B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3703 (5th ed. 2023) ("A removing defendant who seeks to establish that the amount in controversy is greater than the jurisdictional requirement does not automatically concede that it is recoverable.").

Although both of Zanetich's claims rest on the same underlying fact – the rescission of his job offer based on his positive marijuana test – they rely on different legal theories. Count I depends on the legal conclusion that CREAMMA contains an implied remedy for violations of its pre-employment protections. Count II hinges on the applicability of New Jersey's public policy employment exception to the rescission of a job offer based on a positive drug test for cannabis.

Walmart moved to dismiss both counts for a failure to state a claim upon which relief can be granted by arguing that neither legal theory was viable. *See* Fed. R. Civ. P. 12(b)(6). Its arguments persuaded the District Court, which granted the motion and dismissed the case. *See Zanetich v. Wal-Mart*

*Stores E., Inc.*, 2023 WL 3644813, at *4–10 (D.N.J. May 25, 2023).[8]

Through a timely notice of appeal of that final decision, Zanetich invoked this Court's appellate jurisdiction, *see* 28 U.S.C. § 1291, and he now contends that the District Court erred as a matter of law in dismissing both claims.

## IV. DISCUSSION

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint under the plausibility pleading standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kedra v. Schroeter*, 876 F.3d 424, 440–41 (3d Cir. 2017). In its motion to dismiss, Walmart did not argue that any of Zanetich's allegations should be disregarded as conclusory or speculative, so they are taken as true and all reasonable factual inferences are drawn in Zanetich's favor. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327–28 (3d Cir. 2022). But even under that favorable reading of the complaint, Walmart contends that Zanetich does not state a claim for relief as a matter of law. And if there is no version of facts under which Zanetich could state a claim, then his complaint necessarily fails the plausibility standard. *Compare Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007), *with Iqbal*, 556 U.S. at 678, *and Twombly*, 50 U.S. at 556–57.

---

[8] Although the District Court's order did not indicate whether the dismissal was with or without prejudice, under the "default rule" for involuntary dismissals it was with prejudice, *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020) (citing Fed. R. Civ. P. 41(b)).

**A. Count I Was Properly Dismissed Because CREAMMA Does Not Imply a Remedy for Job Applicants Who Fail Drug Tests for Cannabis.**

To create a private cause of action, a law must provide not only a private right but also a private remedy. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002) (declining to infer a private cause of action from a statute that did not contain "rights-creating language"). The dividing line between those two components of a private cause of action has not always been well defined. At the beginning of the Republic, rights were understood to necessarily imply corresponding remedies under the "general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803) (quoting 3 William Blackstone, Commentaries *23); *see also Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 24 (1981) (Stevens, J., concurring in judgment) ("Since the earliest days of the common law, it has been the business of courts to fashion remedies for wrongs."). Under that view, it would be "a monstrous absurdity in a well organized goverment [sic], [if] there should be no remedy, although a clear and undeniable right should be shown to exist." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 624 (1838). Thus, when a violation of the statutory right caused an injury to a member of the class "for whose especial benefit the statute was enacted, the right to recover the damages from the party in default [was] implied." *Tex. & Pac. Ry. Co. v. Rigsby*, 241 U.S. 33, 39 (1916). This view prevailed even into the mid-twentieth century, extending beyond implying a damages remedy to allow an inference of "any available remedy" from a private statutory right. *Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also J. I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964) ("It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded." (quoting *Bell*, 327 U.S. at 684)).

But as statutes became more complex and allowed for enforcement by administrative agencies, the implication of a private remedy for a violation of a statutory right became less automatic and more nuanced. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377 (1982); *see also Middlesex Cnty.*, 453 U.S. at 24–25 (Stevens, J., concurring in judgment). For instance, the Supreme Court resisted implying remedies for "general regulatory prohibition[s] enacted for the benefit of the public at large." *Merrill Lynch*, 456 U.S. at 376. It also declined to imply a remedy from a statutory right when there were already "elaborate enforcement provisions" in place. *Middlesex Cnty.*, 453 U.S. at 14. "[T]he far better course," the Supreme Court remarked, was for Congress to expressly identify a private remedy or the lack thereof in rights-creating statutes. *Cannon v. Univ. of Chi.*, 441 U.S. 677, 717 (1979).

Even so, private remedies for statutory rights could still be implied – they just could no longer be presumed. That new rule came about in *Cort v. Ash*, 422 U.S. 66 (1975), a case originating from this Circuit. There, the Supreme Court – persuaded by the dissenting opinion of Judge Aldisert[9] – refused to presume that a private remedy should be implied for violations of federal criminal law. *Id.* at 78–79; *see also Middlesex Cnty.*, 453 U.S. at 25 (Stevens, J., concurring in judgment) (explaining that *Cort* "cut back on the simple common-law presumption" that private remedies were implied). In place of that presumption, the Supreme Court

---

[9] *See Cort*, 422 U.S. at 79 ("Every criminal statute is designed to protect some individual, public, or social interest . . . . To find an implied civil cause of action for the plaintiff in this case is to find an implied civil right of action for every individual, social, or public interest which might be invaded by violation of any criminal statute. To do this is to conclude that Congress intended to enact a civil code companion to the criminal code." (quoting *Ash v. Cort*, 496 F.2d 416, 428–29 (3d Cir. 1974) (Aldisert, J. dissenting) (ellipsis in original))).

announced a four-factor test for evaluating whether a private remedy could be implied from a federal statutory right. *Cort*, 422 U.S. at 78. The first and most important factor examined whether the statute provided a special benefit to a particular class of persons. *Id.*[10] The other factors evaluated the specific legislative intent for a remedy, the statute's broad purposes, and federalism concerns. Altogether, the *Cort* test consisted of the following four considerations:

> (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted";
>
> (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one";
>
> (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff"; and
>
> (4) whether the cause of action has been "traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law."

---

[10] *See also Cannon*, 441 U.S. at 690 n.13 ("Not surprisingly, the right- or duty-creating language of the statute" – "where the language of the statute explicitly conferred a right directly on a class of persons that included the plaintiff in the case" – "has generally been the most accurate indicator of the propriety of implication of a cause of action.").

*Id.* (quoting in the first instance *Rigsby*, 241 U.S. at 39). Applying that test, the Supreme Court refused to imply a private remedy for a violation of a federal criminal statute. *Id.* at 80–85.

The *Cort* test was not particularly long-lived at the federal level. As early as 1988, one Justice believed that it had been effectively overruled. *See Thompson v. Thompson*, 484 U.S. 174, 189 (1988) (Scalia, J., concurring in judgment). And in 2001, the Supreme Court more formally narrowed the inquiry for implying a private remedy to an analysis of statutory text and structure. *See Sandoval*, 532 U.S. at 288. It reaffirmed that text-and-structure approach a year later. *See Gonzaga*, 536 U.S. at 286. And by 2007, this Court had observed that "[a]lthough *Cort* has never been formally overruled, subsequent decisions have altered it virtually beyond recognition." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 299 (3d Cir. 2007).

Nevertheless, while the *Cort* test was in vogue, the New Jersey Supreme Court addressed a question similar to the one presented in *Cort*: whether a private remedy could be implied from a penal law. *See In re State Comm'n of Investigation*, 527 A.2d 851, 852–54 (N.J. 1987). To resolve that issue, the New Jersey Supreme Court used the *Cort* test as a guide, and it adopted a modified version of that test for implying a remedy from a state statutory right. *Id.* at 854. Using that modified *Cort* test – consisting of the first three factors, but not the fourth, as the identified federalism concerns are not pertinent to a state statute – the New Jersey Supreme Court reached a similar conclusion to the one in *Cort*: a private remedy could not be implied from the penal statute. *Id.* at 854–56. Thus, like the United States Supreme Court, New Jersey courts are "reluctant to infer a statutory private right of action where the [New Jersey] Legislature has not expressly provided for such action." *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Inc.*, 773 A.2d 1132, 1142 (N.J. 2001). But, unlike the United States Supreme Court, the New Jersey Supreme Court has not

15

replaced its modified *Cort* test with a text-and-structure approach. *See Jarrell v. Kaul*, 123 A.3d 1022, 1029 (N.J. 2015); *R.J. Gaydos*, 773 A.2d at 1143; *see also In re State Comm'n of Investigation*, 527 A.2d at 854.

Despite these meaningful jurisprudential differences, a federal court sitting in diversity is obligated to apply state substantive law, as determined by the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941) (holding that "in diversity cases the federal courts must follow conflict of laws rules prevailing in the states in which they sit"); *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 204 (3d Cir. 2022). And with New Jersey as the forum state, there is no dispute that its choice-of-law rules would require the application of New Jersey substantive law – as opposed to federal law or the substantive law of either Delaware or Arkansas, where Walmart has citizenship.[11] Under an assessment of New Jersey substantive law based on a prediction of how its Supreme Court would rule, *see Repola v. Morback Indus., Inc.*, 934 F.2d 483, 489 (3d Cir. 1991), it is appropriate to apply New Jersey's modified *Cort* test to determine whether a private remedy may be inferred from the rights that CREAMMA established, *see Borough of Longport v. Netflix, Inc.*, 94 F.4th 303, 307 (3d Cir. 2024) (applying the modified *Cort* test to ascertain whether the New Jersey Cable Television Act implies a private remedy). That predictive

---

[11] Even under a formal choice-of-law analysis, when the conduct and the injury occur in the same state, New Jersey presumes that the substantive law of that state will govern. *See P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008); *see also Calabotta v. Phibro Animal Health Corp.*, 213 A.3d 210, 218–19, 225–26 (N.J. Super. Ct. App. Div. 2019); Restatement (Second) of Conflict of Laws § 146(d) (Am. Law Inst. 1971). Here, where both the conduct and the injury occurred in New Jersey, there is no reason to consider rebutting the presumptive application of New Jersey substantive law.

16

judgment is informed, in part, by federal caselaw interpreting the first three *Cort* factors because the New Jersey Supreme Court and New Jersey intermediate appellate courts have relied on federal cases in applying the modified *Cort* test. *See In re State Comm'n of Investigation*, 527 A.2d at 854 (relying on federal cases in applying New Jersey's modified *Cort* test); *Miller v. Zoby*, 595 A.2d 1104, 1108–09 (N.J. Super. Ct. App. Div. 1991) (same).

Applying these principles to this case, Zanetich will have an actionable claim under his first count if, under the modified *Cort* test, CREAMMA implies a private remedy.

### 1. The First *Cort* Factor: Conferral of a Special Benefit on a Particular Class

To satisfy the first *Cort* factor – conferral of a special benefit on a particular class – a statute must, by the "unmistakabl[e] focus" of its own text, benefit a "particular class . . . whose welfare [the legislature] intended to further." *California v. Sierra Club*, 451 U.S. 287, 294 (1981); *see also Am. Tel. & Tel. Co. v. M/V Cape Fear*, 967 F.2d 864, 870 (3d Cir. 1992) (declining to imply a right of action because "the statute [did] not clearly and exclusively articulate a right in that particular class of plaintiff"). A statute that functions as a "general regulatory scheme" for the "benefit [of] the public at large" does not confer a special benefit on a particular class. *Sierra Club*, 451 U.S. at 297–98; *see also Cort*, 422 U.S. at 79–80 (holding that "a bare criminal statute[] with absolutely no indication that civil enforcement of any kind was available to anyone" did not confer a special benefit on any particular class); *In re State Comm'n of Investigation*, 527 A.2d at 853–56 (holding that a statute criminalizing breaches of confidentiality obligations in law enforcement investigations did not confer a special benefit upon the subjects of the investigation whose information was disclosed in violation of the confidentiality provisions). Likewise, a statute that provides a benefit – even one of great value – to some incidental, unidentified class does not meet the special-benefit

17

standard. *See Sierra Club*, 451 U.S. at 294 (explaining that interpreting "especial beneficiary" to mean "any person who would be 'especially harmed' by" a violation of the act would "make[] this factor meaningless"); *Cort*, 422 U.S. at 80 (rejecting an implied remedy when the protection of a particular class was a "subsidiary purpose" of the legislation). And even a statute that benefits a particular class does not confer a special benefit when the benefit to that class is subordinate to the one provided to another readily defined class. *See Rauch v. United Instruments, Inc.*, 548 F.2d 452, 458–59 (3d Cir. 1976) (refusing to imply a statutory remedy for aircraft owners because the "principal beneficiaries" of the statute were air travelers and airplane crews – not aircraft owners); *R.J. Gaydos*, 773 A.2d at 1147 (holding that despite a textual basis for identifying insurance agents as beneficiaries, they were "not members of the class for whose special benefit [the statute] was enacted" because the purpose of the statute was "to benefit New Jersey auto insureds, not insurance agents"); *see also Jarrell*, 123 A.3d at 1029–30 (holding that a state statute requiring physicians to maintain malpractice insurance did not confer a special benefit on patients injured by noncompliant physicians).

Applied here, Zanetich must demonstrate that CREAMMA specially benefits job applicants like himself who test positive for cannabis use. But CREAMMA does not do that.

CREAMMA's first employment protection prohibits adverse employment actions because a person "does *or does not* smoke, vape, aerosolize or otherwise use cannabis items." N.J. Stat. § 24:6I-52(a)(1) (emphasis added). By protecting both users and non-users of cannabis, this provision sweeps very broadly, as every member of the public is either a cannabis user or a cannabis non-user. And without an unmistakable textual focus on cannabis users in particular, this provision does not confer a special benefit on any particular class. *See*

*Cannon*, 441 U.S. at 690–64; *see also In re State Comm'n of Investigation*, 527 A.2d at 854.[12]

CREAMMA's second protection shields employees from adverse employment actions based solely on a positive drug test for cannabis. *See* N.J. Stat. § 24:6I-52(a)(1). While that provision may have an unmistakable textual focus on employees with positive cannabis test results, the clause by its own terms applies only to current employees – not prospective employees. So, as a job applicant, Zanetich is outside of the particular class that this protection may specially benefit.

For these reasons, CREAMMA does not confer a special benefit on job applicants who test positive for cannabis, and the first, most important *Cort* factor is not met here.

## 2. The Second *Cort* Factor: Legislative Intent to Provide a Remedy

The second *Cort* factor examines the explicit or implicit legislative intent to provide a remedy. *See Cort*, 422 U.S. at 78. The *Cort* test was formulated at a time when legislative history was among the touchstones of reading statutes. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 373–74 (2012). And in applying its second factor, the Supreme Court considered primarily legislative history. *See, e.g.*, *Merrill Lynch*, 456 U.S. at 377; *Cannon*, 441 U.S. at 694. Here, however, Zanetich identifies no legislative history for CREAMMA that indicates an

---

[12] Our dissenting colleague argues that the first *Cort* factor is nonetheless satisfied because this provision benefits only the employable public, not the entire public. But even that distinction still leaves a very broad class – all legally employable persons – such that this provision constitutes a general regulatory scheme and not legislation with an unmistakable focus on a particular class. *See Jarrell*, 123 A.3d at 1029–30; *R.J. Gaydos*, 773 A.2d at 1147.

intention to provide a private remedy for a prospective employer's failure to hire a job applicant based on a positive drug test for cannabis. At most, the legislative history states that "an employer would not be permitted to refuse to hire or employ a person, or discharge or take any adverse action against an employee because that person or employee does or does not use cannabis items." Appropriations Committee Report on A.21, Nov. 19, 2020, at 20 [https://perma.cc/63Z6-R8VQ]. But that statement addresses the private rights conferred by CREAMMA; it does not announce a legislative intention to provide a private remedy for their violation.

The second *Cort* factor also allows for consideration of implied legislative intent. *See Cort*, 422 U.S. at 78. Zanetich contends that the lack of an alternative mechanism for enforcement of CREAMMA's employment protections implies a legislative intent to provide remedy for those rights. That argument fails on several levels.

Zanetich's assertion overreads New Jersey precedent. It is a near certainty that New Jersey courts will not regard the second *Cort* factor as satisfied when there is an alternative enforcement mechanism. *See, e.g.*, *R.J. Gaydos*, 773 A.2d at 1148. But the inverse is not equally true. Rather, the absence of an alternative enforcement mechanism does little to suggest a legislative intention to provide a private remedy. It could be that New Jersey simply did not intend to provide one. Applied here, where there already two spheres of silence with respect to a private remedy (the lack of a statutory remedial provision and the absence of express legislative history), the additional omission of an alternative enforcement mechanism for CREAMMA's employment protections does little, if anything, to establish a legislative intent to create a private remedy. Rather, the lack of an express statutory remedial provision and the absence of legislative history are consistent with the conclusion that the New Jersey Legislature did not intend to create a private remedy.

Zanetich's argument loses additional traction because CREAMMA's employment protections may be enforced by alternative means. It is true that the provision Zanetich identifies, which grants the Cannabis Regulatory Commission jurisdiction over "any person who buys, sells, cultivates, produces, manufactures, transports, or delivers any cannabis or cannabis items within [New Jersey]," N.J. Stat. § 24:6I-34a, does not seem to extend to all employers. But that provision is not the sole source of the Commission's authority. Other provisions grant the Commission the power to "oversee[] the development, regulation, and enforcement of activities associated with the personal use of cannabis," *id.* § 24:6I-34(d)(1)(a), and "[t]o investigate and aid in the prosecution of every violation of the statutory laws of this State relating to cannabis and cannabis items and to cooperate in the prosecution of offenders before any State court of competent jurisdiction," *id.* § 24:6I-34(b)(3). Through those other provisions, the Commission's jurisdiction extends to cannabis-related employment matters. Consistent with that understanding, the Commission issued its guidance document about cannabis-related employment actions to "all employers." N.J. Cannabis Regul. Comm'n, *Guidance on "Workplace Impairment"* (2022) [https://perma.cc/25WT-DZWP].

Zanetich emphasizes the lack of employment-related enforcement actions by the Commission, but that does little to satisfy the second *Cort* factor. Enforcement decisions are discretionary, *see Heckler v. Chaney*, 470 U.S. 821, 838 (1985), and the absence of enforcement activity against employers may reflect the Commission's relative priorities instead of a lack of legal authority to initiate such proceedings. Thus, the Commission's post-enactment enforcement inaction is not particularly revealing of the pre-enactment intention of the New Jersey Legislature.

In addition, none of the factual findings codified in CREAMMA reveal a legislative intent to create a private remedy for cannabis-related employment discrimination.

21

Those findings address primarily law enforcement and public health concerns. *See* N.J. Stat. § 24:6I-32(d)–(o). And the sole finding with respect to employment pertains to the negative effect a prior marijuana arrest may have on a person's job prospects. *See id.* § 24:6I-32(n). That expression of legislative sympathy for the effects of prior marijuana arrests lends support to CREAMMA's employment protections, but even that statement does not reveal a legislative intent to create a private remedy for cannabis-related employment discrimination.

Finally, the far stronger inference from the legislative silence regarding a private remedy for cannabis-related employment discrimination is that the Legislature did not intend to provide one. Although New Jersey voters overwhelmingly supported amending the state Constitution to permit the legalization and regulation of marijuana, the Legislature in enacting CREAMMA did not provide a remedy for violating that statute's cannabis-related employment protections. Rather, CREAMMA stated expressly that its cannabis-related provisions should not be construed to "amend or affect in any way any State . . . law pertaining to employment matters." *Id.* § 24:6I-55(a). Against that backdrop, the lack of an express remedy is better understood as a deliberate choice not to provide a remedy rather than an oversight of an intended remedy. *See R.J. Gaydos*, 773 A.2d at 1142 (explaining that "New Jersey courts [are] reluctant to infer a statutory private right of action"); *Burns ex rel. Burns v. Care One at Stanwick, LLC*, 258 A.3d 368, 376 (N.J. Super. Ct. App. Div. 2021) (explaining that courts "assume the Legislature is 'thoroughly conversant with its own legislation and the judicial construction of its statutes'" (quoting *Brewer v. Porch*, 249 A.2d 388, 391 (N.J. 1969))).

That conclusion is reinforced by the New Jersey Legislature's comparative responsiveness in enacting safeguards against other forms of employment discrimination. For instance, as originally enacted in 1945, New Jersey's Law

22

Against Discrimination prohibited employment discrimination on the basis of "race, creed, color, and national origin or ancestry" and provided an express private cause of action for violations of those protections. N.J. Pub. L. No. 1945, ch. 169. Since then, New Jersey has amended the statute nine times to add fourteen protected classes. *See* N.J. Pub. L. No. 1962, ch. 37 (liability for military service); N.J. Pub. L. No. 1970, ch. 80 (marital status or sex); N.J. Pub. L. No. 1972, ch. 114 (physical disability); N.J. Pub. L. No. 1977, ch. 96 (nationality); N.J. Pub. L. No. 1981, ch. 185 (blood type and hereditary cellular traits); N.J. Pub. L. No. 1992, ch. 146 (affectional or sexual orientation and familial status); N.J. Pub. L. No. 1996, ch. 126 (genetic information); N.J. Pub. L. No. 2006, ch. 100 (gender identity or expression); N.J. Pub. L. No. 2013, ch. 220 (pregnancy). New Jersey separately created causes of action for other forms of employment discrimination, including discrimination based on tobacco use. *See* N.J. Stat. §§ 34:6B-1, 34:6B-3 (authorizing a cause of action for violations of the statutory prohibition on discrimination on the basis of tobacco usage); *see also id.* §§ 34:19-3, 34:19-5 (creating a cause of action for violation of New Jersey Conscientious Employee Protection Act, a whistleblower statute); *id.* §§ 34:11-56.2, 34:11-56.8 (creating a cause of action for violation of statute prohibiting gender-based pay discrimination). But even with that statutory framework in place and the repeated exercise of legislative willpower to protect other classes, at no time – not even after the 2020 amendments to its Constitution – has New Jersey created an express cause of action for employment discrimination based on cannabis use. Accordingly, it is more likely that if the New Jersey Legislature intended for CREAMMA to be privately enforced, it would done so expressly, as it has in so many other contexts, instead of "leav[ing] the matter to the happenstance of future judicial construction." *R.J. Gaydos*, 773 A.2d at 1144 (quoting *Miller*, 595 A.3d at 1108).

In sum, the second *Cort* factor is not satisfied here: there is no express statement of a legislative intention to provide a

private remedy for cannabis-related employment discrimination, and the inferences from the legislative silence weigh strongly against implying such an intention.

### 3. The Third *Cort* Factor: Advancing the Principal Purposes of CREAMMA

The third *Cort* factor examines whether implying a private cause of action would further "the underlying purpose of the legislative scheme." *Cannon*, 441 U.S. at 703; *see also Cort*, 422 U.S. at 84 (examining whether the requested remedy would advance "the primary congressional goal"). Here, the New Jersey Legislature memorialized the three underlying purposes of CREAMMA in statutory text. *See* N.J. Stat. § 24:6I-32(a)–(c). Yet, as explained below, none of those is furthered by implying a private cause of action for rescission of a job offer based on a failed cannabis test.

The first underlying purpose of CREAMMA was to regulate cannabis "in a similar fashion to the regulation of alcohol for adults." *Id*. § 24:6I-32(a). But New Jersey does not provide a private cause of action for employment discrimination based on the consumption or non-consumption of alcohol. Thus, for parity with alcohol regulation, a private remedy for loss of employment based on cannabis use should not be inferred.

The second stated purpose for CREAMMA was to "prevent the sale or distribution of cannabis to persons under 21 years of age." *Id*. § 24:6I-32(b). But implying a private remedy for rescission of a job offer based on a failed cannabis drug test does not advance that purpose.

The third principal purpose also counsels against recognizing a private remedy for employment related cannabis discrimination. As codified, that purpose was "to eliminate the problems caused by the unregulated manufacturing, distribution, and use of illegal marijuana within New Jersey." *Id*. § 24:6I-32(c). But implying a cause of action for positive

24

cannabis use does not further that purpose, and it may actually impede it. Were a cause of action to exist for a failed cannabis test regardless of whether the cannabis used was legal or illegal, courts would be protecting and compensating users of illegal cannabis.

In sum, the third *Cort* factor provides no basis for inferring a private remedy for CREAMMA's cannabis-related employment protections.

### 4. Balancing the *Cort* Factors

Ordinarily, once the *Cort* factors have been assessed individually, they are weighed against each other to ascertain whether a private remedy can be implied from a private statutory right. *See R.J. Gaydos*, 773 A.2d at 1143 (instructing courts to weigh *Cort* factors). But such balancing is not necessary here because each of the *Cort* factors counsels against implying a private remedy: (i) CREAMMA does not specially benefit job applicants who fail cannabis drug tests; (ii) there was not a legislative intent to imply a remedy for job applicants who fail cannabis drug tests; and (iii) implying a remedy for job applicants who fail cannabis drug tests is inconsistent with CREAMMA's stated purposes.[13]

---

[13] In addition to each individual factor counseling against implying a private remedy, their combined effect reinforces this result. For instance, under *Cort* factor three, creating a private right of action could perversely incentivize use of unregulated cannabis. That fear comports well with the notion that the Commission is responsible for enforcing CREAMMA's employment protections. As a state agency, the Commission likely would not use its powers to vindicate the employment rights of users of illegal cannabis. This mutually reinforcing understanding of the *Cort* factors allows for the enforcement powers Zanetich argues must exist, but without the risk of perverse incentives that may arise from implying a

As a final effort to validate his first count, Zanetich argues that regardless of the *Cort* test, New Jersey courts readily imply remedies for employment statutes. His argument rests on three cases, but those provide little help. The only case decided by the New Jersey Supreme Court, *Lally v. Copygraphics*, 428 A.2d 1317 (N.J. 1981) (per curiam), recognized a common-law cause of action for a "retaliatory firing attributable to the filing of a workers' compensation claim," *id.* at 1318. The rationale for that ruling was that the New Jersey workers' compensation statute prohibits retaliatory firings, and so there must be a remedy because "[i]f the Legislature had wanted to foreclose a judicial cause of action, it would have done so expressly." *Id.* at 1318–19. That conclusion fits nicely within the pre-*Cort* jurisprudence in which a right was presumed to create a remedy. *See, e.g.*, *Marbury*, 5 U.S. (1 Cranch) at 163. Indeed, *Lally* was decided before New Jersey adopted the modified *Cort* test. *See In re State Comm'n of Investigation*, 527 A.2d at 852–54. But with New Jersey's subsequent adoption of a modified *Cort* test, the rationale of *Lally* for implying a remedy has lost its force. *See R.J. Gaydos*, 773 A.2d at 1143.

The same can be said of Zanetich's reliance on *Peper v. Princeton University Board of Trustees*, 376 A.2d 535 (N.J. Super. Ct. App. Div. 1977), *rev'd*, 389 A.2d 465 (N.J. 1978). In that case, which was reversed on other grounds, the Appellate Division of the Superior Court of New Jersey relied on an unequivocal statutory mandate proscribing sex-based employment discrimination to allow a claim to proceed in court. *Id.* at 539–40. But *Peper* has no persuasive force because it too precedes New Jersey's adoption of the modified *Cort* test.

The final case that Zanetich invokes, *Winslow v. Corporate Express, Inc.*, 834 A.2d 1037 (N.J. Super. Ct. App. Div. 2003),

_____

private remedy for violations of CREAMMA's employment protections.

26

is also distinguishable.  The court in *Winslow* concluded that a private cause of action could be implied for an employee and against the employer for failure to provide updated notice of the method for calculating the employee's commission.  *Id.* at 1042–43.  But beyond citations to *Lally* and *Peper*, the only authority that the court invoked for that proposition, *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887 (N.J. Super. Ct. Law Div. 1999), relied on two *Cort* factors – special benefit and statutory purpose – albeit without attribution to *Cort*, *id.* at 891. Thus, *Mulford*, and by extension *Winslow*, are best understood as implicit applications of the modified *Cort* test, as opposed to separate rules for an implied remedy in employment disputes.   And  if  doubts  remained  about  New  Jersey's dedication to *Cort*, they should have evaporated upon the New Jersey Supreme Court's subsequent reliance on the modified *Cort* test.    *See Jarrell*,  123  A.3d  at  1029;  *R.J. Gaydos*, 773 A.2d at 1143.

In sum, New Jersey remains committed to its modified *Cort* test, and none of the factors under that test are met here. Accordingly,  the  District  Court  did  not  err  in  dismissing Count I of Zanetich's claim.

### B.  New Jersey's public policy exception to at-will employment does not apply here.

Zanetich bases his second count on New Jersey's common-law  public  policy  exception  to  at-will  employment,  first recognized in *Pierce v. Ortho Pharmaceutical Corp.*, 417 A.2d 505, 512 (N.J. 1980).  For the reasons below, that exception protects only employees – not job applicants – and thus it does not encompass claims for failure to hire in violation of public policy.

The New Jersey Supreme Court decided *Pierce* against the backdrop of its common-law doctrine of at-will employment. Under that doctrine, "in the absence of a contract, an employee may be fired for any reason, be it good cause, no cause, or even morally-wrong cause."  *D'Agostino v. Johnson & Johnson,*

*Inc.*, 628 A.2d 305, 311 (N.J. 1993). The plaintiff in *Pierce* was an at-will employee who, as a medical doctor subject to the Hippocratic Oath, expressed concerns about her employer's work on the development of a new drug because one of the ingredients, saccharin, was controversial. *See Pierce*, 417 A.2d at 507–08. While her constructive discharge would have been permissible under the at-will employment doctrine, the doctor sought an exception to permit a claim of termination in violation of public policy. *See id.* at 508; *see also Tartaglia v. UBS PaineWebber Inc.*, 961 A.2d 1167, 1180 (N.J. 2008) (explaining that the claim in *Pierce* was "in the nature of constructive discharge").

In considering that modification to its common law, the New Jersey Supreme Court acknowledged that employees, especially those subject to ethical or professional codes of conduct, may be duty-bound by those codes to refrain from performing certain tasks. *Pierce*, 417 A.2d at 512. It then weighed the employers' interests in "knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy" against the employees' interest in "knowing they will not be discharged for exercising their legal rights" and the public's interests in "employment stability" and in "discouraging frivolous lawsuits by dissatisfied employees." *Id.* at 511. After balancing those interests, the New Jersey Supreme Court created an exception to its at-will employment doctrine to permit at-will employees to bring claims in contract and tort for wrongful termination when the termination resulted from the employee's compliance with an expressly stated "clear mandate of public policy." *Id.* at 512; *cf. id.* (emphasizing that the exception does not extend to an employee's refusal to perform work based on the employee's "personal morals"). In ultimately resolving the dispute, however, the New Jersey Supreme Court determined that the terminated doctor did not qualify for the exception because "the Hippocratic Oath does not contain a clear mandate of public policy that prevented [her] from continuing her research on [the new drug]." *Id.* at 514.

Over time, New Jersey courts have recognized other violations of public policy that suffice for *Pierce* claims. *See Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1008–10 (N.J. 1998) (collecting cases); *see also Ballinger v. Del. River Port Auth.*, 800 A.2d 97, 109–10 (N.J. 2002). But each of those instances has involved claims for wrongful termination brought by former employees, not failure-to-hire claims brought by job applicants.[14] Thus, as articulated in *Pierce*, the exception allows only claims by employees: "*an employee* has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Pierce*, 417 A.2d at 512 (emphasis added).

Finally, a federal court's prediction of state law also requires a sensitivity "to the doctrinal trends of the state . . . and the policies which inform[ed] the prior adjudication[] by the state courts." *Zamboni v. Stamler*, 847 F.2d 73, 81 (3d Cir. 1988) (alterations in original) (quoting *Becker v. Interstate Props.*, 569 F.2d 1203, 1206 (3d Cir. 1977)). Even so, there is no realistic likelihood that the New Jersey Supreme Court would expand *Pierce* to permit failure-to-hire claims by prospective employees. Any expansion of *Pierce* to cover prospective employees would require a rebalancing of the relevant interests. *See MacDougall v. Weichert*, 677 A.2d 162, 167 (N.J. 1996) (emphasizing that the *Pierce* exception was recognized "only after balancing the interests of the employee, the employer, and the public"); *Hennessey v. Coastal Eagle Point Oil Co.*, 609 A.2d 11, 20 (N.J. 1992) ("A 'clear mandate of public policy' must be one that on balance is beneficial to the public."). Under such a rebalancing, at least one of the interests that favored recognition of the *Pierce* exception – the public's interest in employment stability – would not be present because preventing firings promotes employment

---

[14] *See, e.g.*, *Ballinger*, 800 A.2d at 109; *Mehlman*, 707 A.2d at 1001–02; *Barratt v. Cushman & Wakefield of N.J., Inc.*, 675 A.2d 1094, 1098 (N.J. 1996); *Young v. Schering Corp.*, 660 A.2d 1153, 1155 (N.J. 1995) (all current employees).

stability while preventing the rescission of job offers does not. In addition, on two occasions, New Jersey courts have considered and rejected extending *Pierce* to failure-to-hire claims. *See Sabatino v. Saint Aloysius Par.*, 672 A.2d 217, 240 (N.J. Super. Ct. App. Div. 1996) (holding that the *Pierce* exception did not extend to failure-to-hire claims brought by a prospective employee); *see also Lerner v. City of Jersey City*, 2019 WL 1468735, at *4 (N.J. Super. Ct. Apr. 2, 2019) ("[F]ailure to hire is not a cause of action that is recognized under *Pierce*." (citing *Sabatino*, 672 A.2d at 240)). On another occasion, the New Jersey Supreme Court has declined to extend *Pierce* claims to independent contractors for the same reason: they lack the same interest in employment stability as current employees. *See MacDougall*, 677 A.2d at 166 ("[*Pierce*] is designed to protect employees . . . . It does not protect independent contractors[.]").

For further perspective, federal courts have characterized the *Pierce* exception as covering claims brought by employees or former employees – not job applicants. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 149 (3d Cir. 2004) ("The *Pierce* doctrine is about wrongful discharge."); *Lawrence v. Nat'l Westminster Bank of N.J.*, 98 F.3d 61, 73 (3d Cir. 1996) ("[T]he paradigmatic dismissal giving rise to a public policy cause of action is the termination of an employee in retaliation for the employee's refusal to act contrary to public policy."); *cf. Zamboni*, 847 F.2d at 82 (acknowledging that the *Pierce* doctrine may apply to claims by employees wrongfully demoted or suspended). And New Jersey courts have favorably cited those cases for their interpretation of *Pierce*. *See, e.g.*, *Mehlman*, 707 A.2d at 1009 (citing *Zamboni*, 874 F.2d at 83); *see also Cluney v. Mon-Oc Fed. Credit Union*, 2006 WL 2128985, at *18 (N.J. Super. Ct. App. Div. 2006) (citing *Conoshenti*, 364 F.3d at 148–50).

For these reasons, New Jersey has not permitted and likely would not permit Zanetich to pursue a claim for failure-to-hire in violation of public policy.

30

### C. Zanetich's Remaining Challenges Lack Merit.

Zanetich raises two additional arguments. He contends that the District Court, upon dismissing his complaint, should have allowed him to make curative amendments. He also seeks certification of the two dispositive issues to the New Jersey Supreme Court. Neither of those arguments succeeds.

### 1. The District Court Was Not Required to Allow a Curative Amendment.

Zanetich asserts that because this is a civil rights case, the District Court was required to dismiss his complaint without prejudice and allow an opportunity for curative amendment. But this Court's willingness to permit an opportunity for curative amendment is limited to cases involving federally recognized civil rights. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251, 253 (3d Cir. 2007); *Dist. Council 47, Am. Fed'n of State, Cnty. & Mun. Emps. v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986); *but cf. Iqbal*, 556 U.S. at 687 (not requiring an opportunity to amend in a dismissed federal civil rights case); *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 168–69 (1993) (ruling that federal courts could not impose a heightened pleading standard in conflict with the Federal Rules of Civil Procedure for federal civil rights cases). And in this case, Zanetich seeks to vindicate his civil rights under New Jersey law, not federal law. Thus, the District Court was not under an obligation to allow an opportunity for curative amendment. *See LabMD, Inc. v. Bobak*, 47 F.4th 164, 192–93 (3d Cir. 2022) (explaining that the rule allowing an opportunity for curative amendment does not apply outside the context of a federal civil rights case).

**2. This Case Does Not Merit Certification to the New Jersey Supreme Court.**

Zanetich also requests that the challenges to the viability of both of his claims be certified to the New Jersey Supreme Court. *See* 3d Cir. L.A.R. 110.1 (allowing certification of questions to state supreme courts that allow such certification); N.J. R. App. Prac. 2:12A-1 (permitting the New Jersey Supreme Court to accept certified questions from the Third Circuit). But certifying an issue to a state supreme court is an act of judicial discretion, *see* 3d Cir. L.A.R. 110.1, and here none of the common considerations associated with the exercise of that discretion counsels strongly in favor of certification.

One of those considerations is the likelihood of resolving an uncertain legal issue. *See United States v. Defreitas*, 29 F.4th 135, 141 (3d Cir. 2022). But here, neither question suffers from a high degree of uncertainty. For the first issue, New Jersey unequivocally uses a modified *Cort* test for ascertaining whether a state statute implies a private remedy, *see R.J. Gaydos*, 773 A.2d at 1143, and application of that test is straightforward. For the second issue, New Jersey state courts have not indicated any willingness to extend the *Pierce* exception to failure-to-hire claims by job applicants. *See Sabatino*, 672 A.2d at 240. Thus, if instead of being removed to federal court, this case would have remained in the New Jersey court system, it is unlikely that the reasoning for the decision or the outcome would be different. Accordingly, the degree of uncertainty is not great enough to justify certification.

Another common consideration in the certification decision is the importance of the question to be certified. *See Defreitas*, 29 F.4th at 142. The issues here, however, do not involve questions of state constitutional law, nor are they particularly transcendental. The first question is one of statutory construction localized to CREAMMA. The second issue seeks

to allow a claim that has been the subject of very few, seemingly only one, reported New Jersey state-court decision in the past forty-plus years. *See Sabatino*, 672 A.2d at 240; *cf. Lerner*, 2019 WL 1468735, at *4. For these reasons, if this case would have remained in the state-court system, it is unlikely that the New Jersey Supreme Court would exercise discretionary jurisdiction over a petition to review either of the two issues on which certification is sought. *See* N.J. Ct. R. 2:12-4 (explaining that review by Supreme Court of New Jersey is granted only if the issue is of "general public importance" or the appellate decision conflicts with other precedent).

Considerations of judicial economy also disfavor certification. *See Defreitas*, 29 F.4th at 142. The certification process takes additional time. And that time would not be well spent if the New Jersey Supreme Court declines certification. But even if the New Jersey Supreme Court were to accept certification, as helpful as its decision may be, it would likely rest on principles that have been known for decades: New Jersey uses a modified version of the *Cort* test, and New Jersey courts have not exhibited any willingness to extend the *Pierce* exception to include claims by job applicants. So, while authoritative statements of state law are always welcome, it is unnecessary to delay resolution of these issues in favor of the possibility of certification, which does not appear to be an efficient use of the time and other resources of the Justices of the New Jersey Supreme Court.

## V. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment.

**FREEMAN**, *Circuit Judge*, concurring in part and dissenting in part.

In 2020, New Jersey citizens voted to amend their State Constitution to legalize the recreational use of marijuana. The month after that constitutional amendment took effect, the New Jersey legislature enacted the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA). CREAMMA regulates marijuana manufacture, sales, personal use, and consumer protections in New Jersey. As relevant here, it prohibits employers from refusing to hire job applicants solely due to their personal use of marijuana. However, CREAMMA does not expressly permit a prospective employee who is not hired because of cannabis use to seek redress in court. In the absence of such an express cause of action, we must determine whether the statute contains an implied cause of action.

To do so, we apply New Jersey law. Because New Jersey's Supreme Court has not addressed this precise issue, we must predict how it would rule. Fortunately, several New Jersey authorities guide our path. Following that path, I predict that the New Jersey Supreme Court would discern an implied cause of action for failure to hire in violation of CREAMMA.

The District Court concluded otherwise, and the majority of this Court does the same (albeit for different reasons). I read the New Jersey authorities differently. At a minimum, I would certify this question of law to the New Jersey Supreme Court—the "most appropriate forum" to weigh the public policy interests underlying CREAMMA's employment protections. *See United States v. Defreitas*, 29

1

F.4th 135, 142 (3d Cir. 2022).  Thus, I respectfully dissent from Sections IV.A and IV.C.2 of the majority opinion.

Additionally, while I concur in the majority's conclusion that the District Court had diversity jurisdiction to hear this case, I reach that conclusion without including punitive damages in the amount in controversy.  Walmart bears the burden of proving jurisdiction.  And, contrary to the jurisdictional statements it made in its notice of removal, Walmart now asserts that punitive damages are unavailable to Zanetich as a matter of New Jersey law.  Unsurprisingly, Zanetich disagrees.  But we need not resolve that dispute because this matter satisfies the amount-in-controversy requirement even without punitive damages.  For the benefit of future cases, I explain how I reach that conclusion where the amount in controversy is based on a prospective employee's relatively modest hourly wage.

## I

28 U.S.C. § 1332(a) restricts a federal district court's diversity jurisdiction to "civil actions where the matter in controversy exceeds the sum or value of $75,000."  And "federal diversity jurisdiction is generally determined based on the circumstances prevailing at the time the suit was filed." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 395 (3d Cir. 2016) (citation omitted); *Angus v. Shiley Inc.*, 989 F.2d 142, 145 (3d Cir. 1993) (determining the amount in controversy based on the allegations in a complaint that was later removed to federal court).

When determining whether the amount in controversy exceeds $75,000, the Court "generally accept[s] a party's good

faith allegation of the amount in controversy," *Columbia Gas Trans. Corp. v. Tarbuck*, 62 F.3d 538, 541 (3d Cir. 1995), "unless it appears to a legal certainty that plaintiff was never entitled to recover the jurisdictional amount," *Kaufman v. Allstate*, 561 F.3d 144, 151 (3d Cir. 2009). The "party who urges jurisdiction on a federal court bears the burden of proving that jurisdiction exists." *Boyer v. Snap-On Tools Corp.*, 913 F.2d 108, 111 (3d Cir. 1990).

This case began in June 2022 when Zanetich sued Walmart in state court. He sought back pay, front pay, and punitive damages for his alleged harms, but he did not specify the amount in controversy.

Walmart removed the matter to federal court in September 2022 and asserted federal jurisdiction based on the parties' diversity of citizenship. It in notice of removal, it alleged that, together, Zanetich's demands for front pay, back pay, and punitive damages satisfy the amount-in-controversy requirement. First, it calculated back pay of approximately $24,000 as of the date of removal. (It relied on Zanetich's offer letter providing a start date of February 7, 2022, and a salary of $19.85 per hour for a 40-hour work week.) Second, it stated that Zanetich's front-pay demand could exceed the amount of back pay. By way of example, it stated that front pay calculated for one year would exceed $41,000. Third, it asserted that Zanetich's demand for punitive damages placed even more money in controversy, resulting in an amount over $75,000.

Later, in a letter brief to us, Walmart argued that punitive damages are unavailable to Zanetich. It invoked our case law holding that punitive damages are not included in the

amount-in-controversy analysis where they are "patently frivolous and without foundation," such as when "they are not permitted under state substantive law." *Huber v. Taylor*, 532 F.3d 237, 244 (3d Cir. 2008) (cleaned up). It also cited New Jersey law stating that punitive damages are available only where the plaintiff proves his harm was caused by actions the defendant took with malice or wanton and willful disregard of foreseeable harm. N.J. Stat. Ann. § 2A:15-5.12. According to Walmart, nothing in Zanetich's complaint plausibly satisfies this standard.

For the purposes of our jurisdictional analysis, I accept Walmart's current position that punitive damages are unavailable. But the amount in controversy plausibly exceeds $75,000 based on back pay and front pay alone.

Although *Auto-Owners* guides us to assess the circumstances "at the time of the complaint's filing," 835 F.3d at 396, the back-pay calculation is not limited to lost wages that had accrued through June 2022 when Zanetich filed his complaint.[1] Nor is that calculation limited to lost wages through the date when Walmart removed this case to federal court. *See Angus*, 989 F.2d at 145. Rather, we consider the amount of back pay Zanetich plausibly could accrue between his would-be start date at Walmart and a judgment in his favor. *See Foley v. Devaney*, 528 F.2d 888, 889 n.1 (3d Cir. 1976) (per curiam) (deeming the amount in controversy "to exceed $10,000 although the claimed benefits do not yet total that

---

[1] "Front pay refers to future lost wages accruing after a jury's verdict, whereas back pay refers to lost wages already accrued as of that date." *Donelson v. Dupont Chambers Works*, 20 A.3d 384, 388 n.9 (N.J. 2011).

sum") (citing *Aetna Cas. & Surety Co. v. Flowers*, 330 U.S. 464 (1947); *Cuevas v. Wentworth Grp.*, No. A-3079-11T3, 2014 WL 4494166, at *23 (N.J. Super. Ct. App. Div. Sept. 15, 2014) ("Back pay is measured from the date of discharge to the date of the verdict" (citing *Gimello v. Agency Rent-A-Car Sys.*, 594 A.2d 264, 279 (N.J. Super. Ct. App. Div. 1991))). We also consider the front pay Zanetich plausibly could win if he prevails. *See Donelson*, 20 A.3d at 388 n.9 ("[f]ront pay refers to future lost wages accruing after a jury's verdict").[2]

On this record, and given the uncertain amount of time for which Zanetich could be entitled to back and front pay, I cannot say with legal certainty that the amount in controversy from future damages was below § 1332(a)'s threshold when Zanetich filed his complaint.

---

[2] At least three of our sister circuits consider damages in this same way when assessing the amount-in-controversy requirement. *See Chavez v. JP Morgan Chase & Co.*, 888 F.3d 413, 417 (9th Cir. 2018) ("If a plaintiff claims at the time of removal that her termination caused her to lose future wages, and if the law entitles her to recoup those future wages if she prevails, then there is no question that future wages are 'at stake' in the litigation. . . . That the amount in controversy is assessed at the time of removal does *not* mean that the mere futurity of certain classes of damages precludes them from being part of the amount in controversy."); *Ashford v. Aeroframe Servs., LLC*, 96 F.4th 783, 797 n.8 (5th Cir. 2024) (concluding that, "although past wages due may be negligible, future lost wages [and] future benefits lost" can satisfy the amount in controversy) (cleaned up); *Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 515 (7th Cir. 2006) (including "lost wages (past and future)" when assessing the amount in controversy).

## II

"Our role in diversity cases is to apply state law." *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 253 (3d Cir. 2010). Because we lack "a definitive ruling" by the New Jersey Supreme Court on the issue in this case, "we must predict how that court would rule if faced with the issue." *Meyer v. Cuna Mut. Ins. Soc.*, 648 F.3d 154, 164 (3d Cir. 2011) (citation omitted). We make that prediction by "look[ing] to decisions of state intermediate appellate courts . . . as well as to analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Id.* (cleaned up).

Although "New Jersey courts have been reluctant to infer a statutory private right of action where the Legislature has not expressly provided for such action," they have an established method for discerning when it is appropriate to do so. *R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co.*, 773 A.2d 1132, 1143 (N.J. 2001). They consider "whether: (1) plaintiff is a member of the class for whose special benefit the statute was enacted; (2) there is any evidence that the Legislature intended to create a private right of action under the statute; and (3) it is consistent with the underlying purposes of the legislative scheme to infer the existence of such a remedy." *Id.* And when they weigh these factors, their "primary goal has almost invariably been a search for the underlying legislative intent." *Id.* (citation omitted).

The New Jersey Supreme Court adopted these factors from the United States Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66 (1975). *See R.J. Gaydos.*, 773 A.2d at 1143.

As the majority opinion details, *Cort* no longer governs federal law on implied causes of action.  Maj. Op. at 13–16.  Federal courts instead look to the text and structure of the statute.  *Id.* at 15.  But that is of no moment here because "the essence of diversity jurisdiction is that a federal court enforces State law and State policy."  *DiAnoia Eatery, LLC v. Motorists Mut. Ins. Co.*, 10 F.4th 192, 209 (3d Cir. 2021).  Were it otherwise, we would undermine the *Erie* doctrine, "which requires federal courts to treat diversity claims so as to discourage forum shopping and to reach results identical to the state courts."  *Edelson v. Soricelli*, 610 F.2d 131, 135 (3d Cir. 1979).[3]

My examination of New Jersey authority leads me to predict that the New Jersey Supreme Court would recognize an implied private right of action for Zanetich to enforce CREAMMA's employment protections.

## A. Factor One

New Jersey's first implied-private-right-of-action factor asks whether "plaintiff is a member of the class for whose

---

[3] The District Court stated that its analysis of the implied-private-right-of-action question "is guided by *federal courts'* reluctance to interpret a state statute to create a private right of action where a private right of action is not expressly stated in the statute."  *Zanetich v. Wal-Mart Stores East, Inc.*, No. 1:22-cv-05387, 2023 WL 3644813, at *5 (D.N.J. May 25, 2023) (emphasis added).  But when exercising diversity jurisdiction, federal courts have no more or less reluctance to find an implied private right of action than the state's courts have.  We must apply the relevant state's substantive law with the goal of rendering the judgment the state's courts would have entered but for the removal to federal court.

special benefit the statute was enacted." *R. J. Gaydos*, 773 A.2d at 1143. Here, Zanetich sued under CREAMMA's employment-protection provision. The relevant text states that "[n]o employer shall refuse to hire or employ any person or shall discharge from employment or take any adverse action against any employee with respect to compensation, terms, conditions, or other privileges of employment because that person does or does not smoke, vape, aerosolize or otherwise use cannabis items . . . ." N.J. Stat. Ann. § 24:6I-52(a)(1).[4] So it benefits any person who has suffered a refusal to hire or any employee who has suffered an adverse employment action because of use or nonuse of cannabis.

Zanetich alleges in his complaint that Walmart refused to hire him due to his use of cannabis. Taking this well-pleaded allegation as true, Zanetich is a member of the class for whose special benefit the statute was enacted.

The majority concludes otherwise. It reasons that this provision was not enacted to protect people like Zanetich because it "protect[s] both users and non-users of cannabis," so it "sweeps very broadly, as every member of the public is either a cannabis user or a cannabis non-user." Maj. Op. at 18. But that reasoning elides key language in the statute. CREAMMA's employment protection applies to any person whom an employer "refuse[s] to hire or employ . . . or . . . discharge[s] from employment or take[s] any adverse action

---

[4] Elsewhere, CREAMMA clarifies that it does not prevent employers from "maintain[ing] a drug-and alcohol-free workplace or require an employer to permit or accommodate the use" or consumption of cannabis "or intoxication by employees during work hours." N.J. Stat. Ann. § 24:6I-52(b)(1)(a).

against" because of cannabis use or nonuse. N.J. Stat. § 24:6I-52(a)(1). That is a select class: it includes only people who have been denied employment because of cannabis use or nonuse, or whose employment has been adversely affected because of cannabis use or nonuse. It does not include the countless people whose cannabis use or nonuse has led to no adverse effects on their employment or prospective employment.

CREAMMA's legislative history confirms that its employment protection was intended to benefit a limited class of people that includes Zanetich. *See Jarrell v. Kaul*, 123 A.3d 1022, 1030 (N.J. 2015) (consulting legislative history to discern whether the legislature intended to imply a cause of action). According to the New Jersey Assembly's Appropriations Committee, CREAMMA provides "consumer and *employee protection*s" designed for "individuals" who face a "penalty in any manner, or *deni[al of] any right or privilege, including but not limited to . . . disciplinary action by a business* . . . solely for engaging in conduct with respect to personal use cannabis activities as permitted under [CREAMMA]." NJ Assemb. Approp. Comm. Statement, 220th Legislature, re A.B. No. 21, Jan. 22, 2021 (emphasis added).

This conclusion is further supported by a New Jersey appellate court decision. In *Winslow v. Corporate Express, Inc.*, New Jersey's intermediate appellate court addressed whether the state's Wage Payment Law contains an implied private cause of action. 834 A.2d 1037, 1043 (N.J. Super. Ct. App. Div. 2003). That law required an employer to provide notice before changing pay rates. *Id.* at 1041–42. The court determined that "employees are the obvious special

beneficiaries" of that law. *Id.* at 1043. It also noted that, in the absence of an express cause of action, New Jersey "courts have readily found an implied private right of action in statutes enacted to protect employees from wrongful conduct by employers." *Id.* at 1043. As the majority rightly notes, the *Winslow* court reached this conclusion through an "implicit application[] of the modified *Cort* test," as adopted by the New Jersey Supreme Court. Maj. Op. at 27. And the class protected by the Wage Payment Law in *Winslow* is broader than the class protected by CREAMMA's employment protection. *See* Maj. Op. at 18–19 (opining that the class at issue here is too broad to satisfy the first implied-private-cause-of-action factor).

Instead of relying on the numerous federal court decisions discussed in the majority opinion, *see* Maj. Op. at 17–19, I am guided by the text of CREAMMA's employment provision and New Jersey authority. Those sources persuade me that CREAMMA's employment provision was created to protect a class of people that includes Zanetich.

## B. Factor Two

The second factor asks whether "there is any evidence that the Legislature intended to create a private right of action under the statute." *R.J. Gaydos*, 773 A.2d at 1143. In seeking the legislature's intent, we must be mindful that the New Jersey Supreme Court has found a "clear legislative intent to construe CREAMMA and its companion bills broadly and robustly so as to achieve their remedial purposes." *State v. Gomes*, 288 A.3d 825, 841 (N.J. 2023); *Young v. Schering Corp.*, 660 A.2d 1153, 1158 (N.J. 1995) ("Where the Legislature's intent is remedial, a court should construe a statute liberally").

On the same day that the legislature enacted CREAMMA (including the employment protection at issue in this case), it enacted a separate employment protection forbidding any current or potential employer from making an adverse employment decision based solely on an applicant's prior marijuana arrest, charge, conviction, or adjudication of delinquency.  N.J. Stat. Ann. § 34:6B-21 (hereafter "Prior Marijuana Prosecution Law").  The legislature specified that "nothing set forth in this section shall be construed" as "authorizing a private cause of action by an aggrieved person" alleging a violation of the Prior Marijuana Prosecution Law's employment protection.  N.J. Stat. Ann. § 34:6B-21(c).

The legislature's express foreclosure of a private cause of action under the Prior Marijuana Prosecution Law—but not for CREAMMA's employment-protection provision enacted that very day—is telling.  It mirrors the circumstances in *Coleman v. Martinez*, 254 A.3d 632 (N.J. 2021).  *Coleman* involved a New Jersey statute immunizing licensed clinical social workers from suit.  *Id.* at 647.  When a non-clinical social worker sought immunity under that statute, the New Jersey Supreme Court observed that the legislature passed two different statutes during the same legislative session: one concerned clinical social workers and the other concerned non-clinical social workers.  *Id.*  Based on the proximity of those legislative actions, the court remarked, "[W]e assume that the legislature knew precisely what it was doing when it" extended immunity to one group and not the other.  *Id.*  "Indeed, statutes that deal with the same matter or subject should be read in *pari materia* and construed together as a unitary and harmonious whole[,] . . . especially . . . when the statutes in question were passed in the same session."  *Id.* (cleaned up).  It concluded, "Had the legislature intended to confer immunity on licensed

social workers, it would have stated so, and if the failure to provide immunity to social workers was an oversight, any corrective measure must be taken by the Legislature." *Id.*

Applying this principle here, I assume the legislature knowingly foreclosed a private cause of action under the Prior Marijuana Prosecution Law's employment protections and opted—on that same day—not to do so for CREAMMA's similar protections.

Further, when assessing whether the legislature implied a cause of action, the New Jersey Supreme Court and Appellate Division often invoke the principle that "[i]f the legislature had wanted to foreclose a judicial cause of action, it would have done so expressly." *Lally v. Copygraphics*, 428 A.2d 1317, 1319 (N.J. 1981); *Young v. Schering Corp.*, 660 A.2d 1153, 1159 (N.J. 1995) (quoting this statement from *Lally* in a wrongful discharge case); *Campione v. Adamar of New Jersey*, 714 A.2d 299, 309 (N.J. 1998) ("The absence of any express provision for a cause of action[,] . . . however, does not necessarily mean that the Legislature intended that no such actions should exist"); *Boldt v. Corresp. Mgmt., Inc.*, 726 A.2d 975, 982 (N.J. Super. Ct. App. Div. 1999) ("If the Legislature intended to foreclose plaintiffs . . . from seeking the relief sought here, it would have explicitly limited the availability of that remedy or relief." (citing *Lally*, 428 A.2d 1317); *Muise v. GPU, Inc.*, 753 A.2d 116, 164 (N.J. Super. Ct. App. Div. 2000) (holding "a court can consider all judicial remedies" and "a legislative intent to defeat them will be inferred only if the Legislature has explicitly limited the availability of that remedy or relief" (citing *Campione*, 714 A.2d 299)).

Even Walmart acknowledges that the New Jersey Supreme Court "seemingly appl[ied] a presumption in favor of implied causes of action" in *Lally*. Walmart Br. at 34. But Walmart argues (and the majority agrees) that CREAMMA lacks an implied private cause of action because the statute contains other enforcement mechanisms, including potential regulatory action by the Cannabis Regulatory Commission ("CRC"). *Id.*; Maj. Op. at 21.

Granted, the New Jersey Supreme Court has stated that, "[w]hen the Legislature has *expressly created specific remedies*, a court should always hesitate to recognize another unmentioned remedy." *Jarrell v. Kaul*, 123 A.3d 1022, 1030 (N.J. 2015) (emphasis added). But I discern no express specific remedy for violations of this CREAMMA employment protection. As the majority acknowledges, the CRC's "jurisdiction, supervision, duties, functions, and powers . . . extend to any person who buys, sells, cultivates, produces, manufactures, transports, or delivers any cannabis or cannabis items within this State." N.J. Stat. Ann. § 24:6I-34(a). Walmart participates in none of those activities. So the legislature has not expressly empowered the CRC to remedy Walmart's violation of CREAMMA's employment protection. And although the CRC has the power "[t]o investigate and aid in the prosecution of every violation of the statutory laws of this State relating to cannabis," N.J. Stat. Ann. § 24:6I-34(b)(3), that power only extends within the CRC's jurisdiction, *id.* at 24:6I-34(b) (listing what "[t]he duties, functions and powers of the commission shall include"). Again, that jurisdiction does not extend to Walmart.

The CRC's own interpretation of CREAMMA accords with mine. The CRC explains its function as "writing and

enforcing the regulations that direct the sales, purchases, and business activities related to cannabis in New Jersey." Cannabis Regulatory Commission, *Frequently Asked Questions*, *available at* https://perma.cc/M36U-GXLU. That includes "impos[ing] fines or other sanctions on licensed cannabis business[es] that violate regulations." *Id.*[5] But the CRC "does not perform any law enforcement duties or regulate unpermitted or unlicensed entities in any way[.]" *Id.* It is undisputed that Walmart is not permitted or licensed to have a cannabis business in New Jersey. Therefore, the CRC's position is that it does not enforce any laws against Walmart. Because the New Jersey Supreme Court "places great weight on the interpretation given to a statute by the agency charged with its enforcement," *Clowes v. Terminix Intern., Inc.*, 538 A.2d 794, 803 (N.J. 1988), I cannot agree with the majority's view that the CRC's powers to investigate and to aid prosecution extend to Walmart's employment actions.[6]

---

[5] A licensed cannabis business is "a person or entity registered to do business in New Jersey that holds a conditional or annual cannabis business license or a testing laboratory license." N.J. Admin. Code § 17:30-1.2.

[6] Even if the CRC's jurisdiction extended to Walmart's conduct in this case, I disagree that this would end the inquiry on the legislative-intent factor. *See* Maj. Op. at 20 (opining that there is "near certainty" that New Jersey courts would determine that the presence of an alternative enforcement mechanism resolves the second factor). Although New Jersey courts hesitate to recognize another unmentioned remedy, that hesitation can yield to "strong indicia of a contrary legislative intent." *Jarrell*, 123 A.3d at 1030 (citation omitted). And New Jersey courts have recognized implied private causes of action

In sum, I view the legislative-intent factor in Zanetich's favor. This is consistent with the New Jersey Supreme Court's understanding of the "clear legislative intent to construe CREAMMA and its companion bills broadly and robustly," *Gomes*, 288 A.3d at 841, and the legislature's decision not to foreclose a private right of action for CREAMMA's employment protections.

---

to enforce employment protections in statutes that expressly permit administrative sanctions. *See, e.g.*, *Boldt*, 726 A.2d at 982 (determining that, "[w]hile the Department [of Health] retains the jurisdictional authority to sanction those that violate the rule" at issue, plaintiffs had a private right of action to enforce a regulation where they sought "money damages, a remedy not available at the agency level"); *Muise*, 753 A.2d at 129 ("[A] court can consider all judicial remedies, including damages, which are beyond the agency's authority[.]"); *Mulford v. Computer Leasing, Inc.*, 759 A.2d 887, 891 (N.J. Super. Ct. 2003) (discerning a private cause of action "as a remedy in addition to the penal and administrative sanctions and administrative wage collection proceedings, provided by other sections thereof").

The New Jersey Supreme Court has discerned no legislative intent to authorize a private cause of action "in a statutory scheme that already contains civil penalty provisions," *R.J. Gaydos*, 773 A.2d at 1145; where "a bare criminal statute" contains "absolutely no indication that civil enforcement of any kind was available to anyone," *In re State Comm'n of Inv.*, 527 A.2d 851, 854 (N.J. 1987); and where a statute contains an "elaborate regulatory scheme" for controlling the target of the private suit, *Campione, Inc.*, 714 A.2d at 310. None of those conditions is present here.

## C. Factor Three

The third factor asks whether "it is consistent with the underlying purposes of the legislative scheme to infer the existence of [a private] remedy." *R.J. Gaydos*, 773 A.2d at 1143. I predict that the New Jersey Supreme Court would say it is.

In enacting CREAMMA, the legislature sought to "adopt a new approach to [New Jersey's] marijuana policies by controlling and legalizing . . . cannabis . . . for adults." N.J. Stat. Ann. § 24:6I-32(a). That control and legalization was "designed to eliminate the problems caused by the unregulated manufacturing, distribution, and use of illegal marijuana within New Jersey," *id.* § 24:6I-32(c), "in a way that enhances public health and minimizes harm to New Jersey communities and families," *id.* § 24:6I-32(*l*). As Zanetich argues, New Jerseyans will be less likely to access the lawful, controlled system of cannabis sales the state has established if employers can, without consequence, refuse to hire them for participating in that system. This supports a conclusion that CREAMMA's broad remedial purposes are served by recognizing a private right of action here. *See Bortz v. Rammel*, 376 A.2d 1261, 1266 (N.J. Super. Ct. App. Div. 1977) (determining that a private right of action is consistent with the statutory goal of "assur[ing] prospective and continuing compliance" with construction codes); *Parks v. Pep Boys*, 659 A.2d 471, 478 (N.J. Super. Ct. App. Div. 1995) (concluding that a private right of action helps "assure[] the . . . effectiveness" of a "statute [that] requires certain conduct"); *see also R.J. Gaydos*, 773 A.2d at 1144 (citing *Parks* and *Bortz* as examples where courts inferred private rights of action).

16

**D.  Balance of Factors**

After New Jersey courts consider the three implied-private-right-of-action factors, they weigh these factors with the primary goal of discerning the legislature's intent. *R.J. Gaydos*, 773 A.2d at 1143. In my view, each factor supports Zanetich having an implied private right to enforce CREAMMA's employment protection. Thus, no weighing is necessary. I predict that the New Jersey Supreme Court would recognize this cause of action. I respectfully dissent from the majority's conclusion to the contrary.

**III**

As is now plain, the question in this case is whether CREAMMA gives a prospective employee who is not hired because of cannabis use a private right of action to sue his would-be employer. The New Jersey Supreme Court is best suited to answer that question, so I would certify the question to that court.

Before our Court certifies a question of law to a state's highest court, we consider certain factors. One is whether "the relevant question's eventual resolution [is] unclear and control[s] an issue in the case." *United States v. Defreitas*, 29 F.4th 135, 142 (3d Cir. 2022). The question at issue here controls whether Zanetich can proceed with his lawsuit. And the various opinions in Zanetich's case demonstrate that the eventual resolution of this question is debatable.

The majority and I would resolve the question differently. The majority's reasoning also differs from the

District Court's.  *See Zanetich*, 2023 WL 3644813, at *5 (determining that "the First *Cort* factor weighs in favor of finding an implied cause of action").[7]  And the New Jersey legal authorities seem to contradict each other in ways material to the question before us.  *Compare Miller v. Zoby*, 595 A.2d 1104, 1108 (N.J. Super. Ct. App. Div. 1991) ("the fact that no general cause of action . . . has been created is to us some reliable evidence that the legislature neither intended to create such a cause of action by silence or desired the judiciary to create one by implication"), *with Boldt*, 726 A.2d at 982 ("If the Legislature intended to foreclose plaintiffs . . . from seeking the relief sought here, it would have explicitly limited the availability of that remedy or relief.").  This counsels in favor of certification.

Another factor is the importance of the question to be certified.[8]  *Defreitas*, 29 F.4th at 142.  For instance, when a question involves important public policy choices or value judgments, a state's high court is the appropriate tribunal.  *See id.*  Additionally, when an issue is likely to recur, it "should be certified for an immediate and dispositive resolution."  *Id.*

---

[7]  The District Court also posited that we might find the question in this case suitable for certification to the New Jersey Supreme Court.  *Zanetich*, 2023 WL 3644813, at *10 n.4.

[8]  The majority observes that this case does not involve questions of state constitutional law and the issues are not "particularly transcendental."  Maj. Op. at 32.  When we consider certification, it is proper to consider whether the question is one of state constitutional law.  *Defreitas*, 29 F.4th at 142.  However, transcendentalism—however that term may be defined—is beyond our ken.

The importance factor also counsels in favor of certification. Zanetich's case arises in the wake of a watershed statewide referendum in which New Jerseyans opted to legalize the personal use of marijuana by adults. Effectuating the will of the voters required the legislature to balance private and administrative enforcement mechanisms. The New Jersey Supreme Court—not this Court—should resolve the ambiguities about how the legislature conducted that balancing. Permitting the state high court to do so would support cooperative judicial federalism. *See id.*

This issue is also likely to recur. For decades, New Jersey employers have administered drug tests as a condition of employment in jobs as varied as salespeople, law enforcement officers, funeral home directors, and custodians.[9] Given the sheer number of employment relationships potentially impacted by CREAMMA's employment protections, the issue in this case is likely to arise again.

A third factor is the timeliness of the request for certification. *Defreitas*, 29 F.4th at 142. Zanetich filed his action in state court, where he could have appealed an adverse ruling to a New Jersey appellate court. Zanetich could not seek certification immediately after Walmart removed the action to federal court. *See* N.J. Ct. R. 2:12A–1 (permitting submissions

---

[9] *See Jevic v. Coca Cola Bottling Co. of New York*, No. CIV. A. 89-4431, 1990 WL 109851 (D.N.J. June 6, 1990) (salesperson); *Policemen's Benev. Ass'n of New Jersey, Loc. 318 v. Washington Twp. (Gloucester Cnty.)*, 850 F.2d 133 (3d Cir. 1988) (police officers); *Wild v. Carriage Funeral Holdings, Inc.*, 227 A.3d 1206 (N.J. 2020) (funeral director); *Small v. Rahway Bd. of Educ.*, No. CV 17-1963, 2018 WL 615677 (D.N.J. Jan. 26, 2018) (custodian).

of certified questions of law from this Court but not from federal district courts). He sought certification at his first opportunity to do so—in his brief to this Court.

For all these reasons, I would certify the question of law in this case to the New Jersey Supreme Court.